**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KAISER AEROSPACE & ELECTRONICS
CORPORATION, Kaiser Space Products
Division,
Plaintiff-Appellee,

v.

ALLIANT TECHSYSTEMS,
INCORPORATED,                                                    No. 96-2117
Defendant-Appellant,

and

HERCULES ALLEGANY BALLISTICS
LABORATORY, a Division of
Hercules, Incorporated,
Defendant.

KAISER AEROSPACE & ELECTRONICS
CORPORATION, Kaiser Space Products
Division,
Plaintiff-Appellant,

v.

ALLIANT TECHSYSTEMS,
INCORPORATED,                                                    No. 96-2176
Defendant-Appellee,

and

HERCULES ALLEGANY BALLISTICS
LABORATORY, a Division of
Hercules, Incorporated,
Defendant.

Appeals from the United States District Court
for the Northern District of West Virginia, at Elkins.
Richard L. Williams, Senior District Judge, sitting by designation.
(CA-95-28-2)

Argued: October 27, 1997

Decided: December 17, 1997

Before LUTTIG, Circuit Judge, CAMPBELL, Senior Circuit Judge
of the United States Court of Appeals for the First Circuit, sitting
by designation, and TRAXLER, United States District Judge for
the District of South Carolina, sitting by designation.

_____

Affirmed in part, and reversed and remanded in part, by unpublished
per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert Keith Huffman, MILLER & CHEVALIER,
CHARTERED, Washington, D.C., for Appellant. Ray Manuel Ara-
gon, MCKENNA & CUNEO, L.L.P., Washington, D.C., for Appel-
lee. **ON BRIEF:** Alan I. Horowitz, Benjamin D.M. Wood, MILLER
& CHEVALIER, CHARTERED, Washington, D.C.; James K.
Brown, Christopher L. Callas, JACKSON & KELLY, Charleston,
West Virginia, for Appellant. Larry M. Farrell, Mark D. Shonkwiler,
MCKENNA & CUNEO, L.L.P., Washington, D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Alliant Techsystems, Inc., defendant below, appeals from the district court's grant of summary judgment for Kaiser Aerospace and Electronics Corporation, plaintiff below, on, inter alia, the scope of a contract that existed between Kaiser and Hercules Allegheny Ballistics Laboratory, Alliant's predecessor in interest, and on various counterclaims brought by Alliant against Kaiser. Alliant also appeals, and Kaiser cross-appeals, from the district court's determination of damages at subsequent proceedings. We reverse the district court's grant of summary judgment for Kaiser on the scope of the contract, and remand for further proceedings on this issue. We affirm the grant of summary judgment for Kaiser on Alliant's counterclaims, however, and find it unnecessary to reach the other issues raised by the parties on appeal and cross-appeal.

I.

During the 1980's, the United States Air Force began work on a program to develop and produce a second generation bomber-carried missile for suppressing ground-based radar. This missile was known as the Short Range Attack Missile II ("SRAM II"). Pursuant to this program, the Air Force entered into a prime contract with Boeing Aerospace for the SRAM II missiles in 1987. Boeing, in turn, entered a subcontract with Hercules for rocket motors for Boeing's SRAM II missiles. Hercules, in turn, entered into a subcontract with Kaiser for the nozzles for Hercules' rocket motors.

In October 1991, the government terminated the SRAM II program before the development stage had been completed, and before the production stage had begun. Accordingly, the government terminated its prime contract with Boeing in accordance with Federal Acquisition Regulation ("FAR") § 52.249-2 (1988), incorporated into that contract as the Termination for Convenience clause. The termination of the prime contract triggered Boeing's termination of its subcontract with Hercules, and Hercules' termination of its subcontract with Kaiser, pursuant to the Termination for Convenience clauses included in each of these subcontracts.

Upon termination of the subcontract between Hercules and Kaiser, and in accordance with the Termination for Convenience clause, Hercules and Kaiser engaged in negotiations to settle their accounts. Under the Termination for Convenience clause, which incorporated FAR § 52.249-2, Kaiser, as a terminated subcontractor, was entitled to reimbursement for the costs it had incurred in performing the contract, as well as for lost profits, provided the termination had not saved it from a losing contract. If the termination had, however, saved Kaiser from such a contract, Kaiser was entitled to recover neither all of its costs, nor any lost profits. Accordingly, to calculate how much, if any, money was due Kaiser, it was necessary to identify the end point of the contract to determine whether Kaiser would have made or lost money on the contract.

Hercules and Kaiser were unable to agree, however, on what the end point of the contract was, and, relatedly, whether the contract, if it had not been terminated, would have resulted in a profit or a loss for Kaiser. This disagreement resulted from the fundamentally different positions taken by Hercules and Kaiser as to the scope of the contract that existed between them. That contract was embodied in a master purchase order ("MPO") initially issued by Hercules on September 15, 1989, and reissued with some modifications on October 3, 1989. The MPO identified five phases of work--Development ("DEV"), PRFT (Pre-Flight Readiness Testing), QUAL (Qualification), LRIP (Low Rate Initial Production), and LOT 1 (larger scale lot production). At the time the contract was terminated, Kaiser had completed the DEV stage, had completed approximately two-thirds of the PRFT phase, had barely begun the QUAL stage, and had not performed any work at all on either the LRIP or LOT 1 phases.

Hercules insisted that the MPO initially represented a firm, fixed-price contract for only the first two phases, and that the last three phases were only tentative -- to be negotiated. While conceding that the third phase had also become a firm, fixed-price contract, Hercules maintained this was so only because Hercules and Kaiser had later concluded negotiations as to that phase. At the time the contract was terminated, however, Hercules and Kaiser had just begun negotiating about the last two phases. Accordingly, Hercules argued that the endpoint of the contract was the end of the third phase, at which point Kaiser would clearly have been losing money on the contract.

4

Kaiser, by contrast, argued that the MPO represented a firm, fixed-price contract for all five phases, that the endpoint of the contract was therefore at the end of the fifth phase, and that while it would have been losing money at the end of the third phase, it would have made enough money on the last two phases of the contract to convert the interim loss into a net profit for the entire contract.

When the negotiations between Hercules and Kaiser broke down, Hercules issued a unilateral "settlement by determination," as it was entitled to do under the Termination for Convenience clause and incorporated regulations. This settlement determination, which was premised on Hercules' interpretation of the scope of the contract, found that Hercules did not owe Kaiser any additional money, and that Kaiser actually owed Hercules a small amount of money because the progress payments already made by Hercules to Kaiser slightly exceeded the amount to which Kaiser was entitled under the Termination for Convenience clause.

Kaiser then initiated this litigation against Hercules, asserting, inter alia, a request for declaratory relief on the scope of the contract. Several months later, Alliant acquired the assets of Hercules and assumed responsibility for the defense of this lawsuit. Alliant subsequently discovered that Kaiser had submitted allegedly false representations to Hercules during the settlement negotiations, and raised counterclaims against Kaiser for, inter alia, fraud, negligent misrepresentation, and breach of the implied covenant of good faith and fair dealing. Kaiser moved for partial summary judgment on the scope of the contract, and on the counterclaims for fraud and negligent misrepresentation. Alliant moved for summary judgment on Kaiser's complaint.

The district court referred the litigation to a magistrate judge, who made various findings of fact, and recommended denying all of the motions for summary judgment. See J.A. at 155-70. The district court adopted the magistrate's findings of fact, but granted summary judgment for Kaiser on the scope of the contract -- finding that it was a firm, fixed-price contract for all five phases -- and on Alliant's counterclaims for fraud and negligent misrepresentation. The court also, sua sponte, granted summary judgment for Kaiser on Alliant's counterclaim for breach of the covenant of good faith and fair dealing. See generally J.A. at 232-40. At a subsequent proceeding, the district

5

court adjudicated the amount of money to which Kaiser was entitled based on the termination for convenience. Alliant appeals the grant of summary judgment on the scope of the contract and its counterclaims, and also argues that, even assuming the district court correctly determined the scope of the contract, it erred in calculating damages. Kaiser cross-appeals, arguing that the district court erred in calculating damages.

II.

The MPO states that it is a "firm-fixed price purchase order to furnish all materials, labor, tooling, equipment, and other resources, except as may otherwise be set forth herein, necessary to fabricate, identify, inspect, pack, and deliver the below listed item(s) in exact accordance with the requirements set forth hereunder." J.A. at 495 (emphasis added). The MPO then lists five phases, each with a separate sub-item purchase order number. The MPO treats the first two phases somewhat differently from the last three phases. First, the MPO identifies a single nozzle assembly quantity and a single price for the DEV and PFRT phases. Id. By contrast, for each of the other phases, the MPO identifies the following two alternatives -- (1) a quantity of nozzle assemblies manufactured entirely by Kaiser, and (2) a quantity of nozzle assemblies in which the"shell" component of some of the nozzle assemblies is manufactured by Hercules and furnished by Kaiser. See id. at 495-96. Second, one line below and to the right of the headings of the last three phases, the MPO says "To Be Negotiated." No such words appear in the descriptions of either of the first two phases. See id.

In addition, the MPO states that "Progress payments shall be made against Master Purchase Order 0820058 [the number that appears at the top of the MPO] in accordance with FAR 52.232-15 at (80%) of cost." J.A. at 497. The MPO also expressly incorporates a document entitled Appendix "A," J.A. at 497, which in turn incorporates various FAR provisions, including §§ 52.209-1 and 2. J.A. at 481-82. These provisions appear to prohibit the award of the production phases of the contract (LRIP and Lot 1) until the QUAL phase has been completed. See J.A. at 329-31. In addition, Appendix A reserves Hercules' right to make certain changes relating to matters such as specification and delivery, and provides that if such changes cause

6

changes in the cost of, or the time required for, performance of the contract, Hercules must make "equitable adjustments" to the contract price, delivery schedule, or both. J.A. at 484-85. Finally, Appendix A includes a typical merger clause, that is labeled"Entire Agreement," and states, inter alia, that the MPO and accompanying documents constitute the "complete and exclusive agreement of Hercules and Seller, [and] merges and supersedes all prior understandings and representations (oral and written) . . . . All amendment(s) to this agreement shall be formally authorized in writing by the Hercules Buyer."

The district court interpreted the MPO to constitute a firm, fixed-price agreement for the entire five phases of the contract. The court interpreted the phrase "To Be Negotiated," which appeared within each of the last three phases, to mean only that the parties would negotiate over which option within that phase would be adopted, i.e., whether Kaiser would provide all the nozzle shells, or whether Hercules would provide some of those shells. See J.A. at 235-36. We find that this interpretation constitutes neither an inevitable, nor even the most natural, reading of the MPO. Accordingly, we reverse the district court's grant of summary judgment for Kaiser on the scope of the contract. Because, however, the contract is not entirely free from ambiguity, and because the district court erroneously refused to consider certain proffered course-of-performance and trade-usage evidence that raises factual controversy about the proper interpretation of the contract, we remand the question of the scope of the contract for further proceedings consistent with this opinion.

We believe the phrase "To Be Negotiated" naturally connotes more than merely choosing between two fully explicated options. Under the district court's interpretation of the MPO, it is difficult to understand what, precisely, would be the subject of negotiation. Negotiation suggests compromise, and it is hard to see how any compromise can be involved in an "either/or" decision, especially where, as under the district court's understanding of the MPO, the other terms of the agreement are fixed. Also, on the district court's reading, the phrase "To Be Negotiated" adds little to the meaning of the contract, which already states the two possible options under each of the last three

7

phases, and necessarily implies that a choice will be made about which option to pursue.[1]

If anything, it would be more natural to read the MPO as establishing a firm, fixed-price contract for the first two phases, but as establishing only tentative grounds for negotiation for the last three phases. The phrase "To Be Negotiated," which is placed in each of the last three phases, supports this reading. See J.A. at 495-96. That each of the last three phases has disjunctive options also suggests that the final details are not yet settled. See id. In addition, such a reading is consistent with the MPO's statement that "[t]his is a firm-fixed price purchase order to furnish all materials, [etc.], except as may otherwise be set forth herein . . . ," J.A. at 495 (emphasis added), which can be read to mean that the MPO is only binding unless otherwise designated (e.g., by the words, "To Be Negotiated"). Reading the MPO as establishing a firm, fixed-price contract for only the first two phases is also consistent with Appendix A's incorporation of the qualification regulations, J.A. at 481-82, which suggest that contracts for the production phases (LRIP and LOT 1) cannot be awarded until the QUAL stage had been successfully completed. See J.A. at 329-31.

Although it is most natural to read the contract in this manner, we are unable to conclude with confidence that such a reading is the correct one. The placement of neither the phrase "To Be Negotiated" nor the clause "except as may otherwise be set forth herein" is entirely free from ambiguity.[2] Moreover, as Kaiser emphasizes, the final MPO

_____

[1] At oral argument, Kaiser took the position that the district court's interpretation of the contract was the correct one, apparently abandoning its earlier contention that the phrase "To Be Negotiated" meant only that the parties would negotiate about matters such as price increases resulting from changes in production schedules, specifications, or both. Kaiser's initial reading of the MPO rendered the phrase"To Be Negotiated" completely redundant, because Appendix A explicitly requires equitable adjustments for changes in specifications or delivery requirements. That reading also suggested that equitable adjustments are available only for the last three phases, in direct contradiction to Appendix A, which plainly contemplates equitable adjustments for the entire contract (whatever the scope of that contract may be).

[2] It is worth noting, for example, that in the initial MPO, issued September 15, 1989, the phrase "To Be Negotiated" appeared next to the

8

allows it to bill progress payments against the MPO, even though the initial MPO did not. Kaiser argues that this change allowed it to bill progress payments against the entire value of all five phases. While it is not clear that this is necessarily so, and while Kaiser does not, in fact, appear to have made billings in this manner, the change does support a finding that the MPO is ambiguous, especially in conjunction with the other textual uncertainties.

Because the MPO is not entirely clear, and because the district court erred in refusing to consider Alliant's proffered course-of-performance and trade-usage evidence, compare West Va. Code § 46-2-202 (1996) (U.C.C. § 2-202) (Evidence of course of dealing, trade usage, or course of performance may be used to explain or supplement the terms of a final, integrated agreement.) with J.A. at 234-36 (district court's refusal to consider such evidence), we remand for further proceedings the question of the scope of the contract created by the MPO. Because we conclude that the district court erred in determining the scope of the contract that existed between Hercules and Kaiser, we need not consider Alliant's other arguments relating to its obligation to Kaiser under the contract. Nor need we consider either party's objections to the district court's calculation of damages.

III.

The one remaining issue is whether the district court erred in granting summary judgment for Kaiser on Alliant's counterclaims for neg-

---

heading of each of the last three phases. See J.A. at 477-78. In the modified MPO, issued October 3, 1989, this phrase appears one line lower, next to the heading for the first subheading of each phase. See id. at 495-96. This court was unable to discover whether this change was intentional, either from the record, or from the parties' submissions or oral argument. If intentional, the change might well support the district court's interpretation of the contract, though it would still be unclear what, precisely, was to be negotiated. From the face of the MPO alone, however, it seems at least equally likely that the change was simply typographical.

Similarly, the placement of the second clause may be susceptible to an alternative reading, i.e., that the MPO is a fixed price contract to furnish all materials, etc., except those materials otherwise designated, which could refer to the possibility mentioned in the last three phases of Hercules' supplying some of the nozzle shells.

9

ligent misrepresentation, fraud, and breach of the implied covenant of good faith and fair dealing. These counterclaims are all predicated on certain evidence, obtained by Alliant from Kaiser during discovery, that suggests Kaiser made false representations to Hercules about the amount of "management consideration" included in its settlement proposals. Alliant argues that these misrepresentations caused it to spend more money on the negotiations than it need otherwise have spent, and may also have contributed to the need for litigation. Having reviewed the record and submissions of the parties, and having had the benefit of oral argument, we are of the opinion that the district court correctly determined that Alliant has failed to prove reliance, i.e., that Hercules would have acted differently but for the misrepresentation. Moreover, given the essentially irreconcilable views of the scope of the contract taken by Kaiser and Hercules during the settlement negotiations, as well as the large sums of money in dispute, we believe that extensive negotiation and litigation were probably inevitable anyway, regardless of Kaiser's alleged misrepresentations. Although Alliant has introduced testimony that it spent approximately $50,000 more on the negotiations than it would have had Kaiser been completely forthright, we believe this evidence is merely speculative in light of the distance between the parties' bargaining positions. For both of these reasons we affirm the district court's grant of summary judgment for Kaiser on Alliant's counterclaims for negligent misrepresentation and fraud, and for the latter reason we affirm the district court's grant of summary judgment for Kaiser on Alliant's counterclaim for breach of the implied covenant of good faith and fair dealing.

CONCLUSION

For the reasons stated herein, we affirm the district court's grant of summary judgment for Kaiser on Alliant's counterclaims, but reverse its grant of summary judgment for Kaiser on the scope of the contract that existed between Kaiser and Hercules, and remand this issue for further proceedings consistent with this opinion.

AFFIRMED IN PART, AND REVERSED AND REMANDED IN PART

10